IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANINE INEZ MILBOURN | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| | : | NO. 19-5191 |
| v. | : | |
| | : | |
| ANDREW M. SAUL[1], | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

**<u>MEMORANDUM OPINION</u>**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                      August 10, 2020

  This action was brought pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), which denied the application of Janine Inez Milbourn ("Milbourn") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the "Act"). Presently before the Court is Plaintiff's Brief and Statement of Issues in Support of Request for Review ("Pl. Br.") (Doc. 10); Defendant's Response to Plaintiff's Request for Review ("Def. Br.") (Doc. 11); and the record of the proceedings before the Administrative Law Judge ("ALJ") (Doc. 7) (hereinafter "R."). Plaintiff asks the Court to reverse the decision of the ALJ. The Commissioner seeks the entry of an order affirming the decision of the ALJ. For the reasons set forth below, we deny the request for review and affirm the ALJ's decision.

---

[1] Andrew Saul is now the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, therefore, he should be substituted for Nancy A. Berryhill as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.     **FACTUAL AND PROCEDURAL HISTORY**

Milbourn filed her claim for DIB on January 5, 2016, alleging disability beginning on November 1, 2015 arising from a number of conditions, including asthma, diabetes, migraines, depression, anxiety, fibromyalgia, and a bad back. (R. 12, 165.) She had an associate degree and a 17-year past work history, including as a payroll clerk and an accounting clerk. (R. 23.) She was "let go" from her work around the time of her alleged onset date reportedly because she had to take time off work due to, as she reported, her development of heart palpitations and deteriorating health with symptoms of anxiety. (R. 18, 166.) She asserted at the time of her application that her conditions interfered with her ability to work as far back as January 2015. When asked in 2018 what interfered with her ability to work, she identified agoraphobia as the primary factor, indicating that it led to difficulty eating and leaving her home. (R. 18.) She lived with her mother and a teenage daughter who had severe autism, schizophrenia, and epilepsy. (*Id.*) In the months preceding her DIB application, Milbourn also experienced the loss of three members of her immediate family. (R. 20.)

Milbourn had been prescribed anti-depressant medication by her primary care physician, Peter Cianfrani, M.D., at least as far back as December 2013. (R. 376 (medication list includes Duloxetine, generic version of Cymbalta).) Dr. Cianfrani also prescribed an anti-anxiety medication as part of her daily regimen as far back as at least January 2014. (R. 366, 376 (medication list Lorazepam, generic version of Ativan).) While the treatment notes from Dr. Cianfrani contained in the record consistently include anxiety and depression in Milbourn's "problem list," her visits to him during this time were for various other health concerns and offer little insight into her psychiatric condition. When she presented at an appointment on December 3, 2015, the "chief complaint" listed by Dr. Cianfrani was that she had "recently been fired from

job, would like to discuss disability." (R. 324.) He did not note any mental health complaints at that time nor make any changes in her psychiatric medications.

At her mother's suggestion, given that she was feeling "overloaded," Milbourn sought outpatient mental health treatment in the spring of 2016 with Penn Foundation Behavioral Health Services ("Penn Foundation"). She recounted to personnel there the significant stressors in her life and a history of anxiety and depression. As of the time of her intake evaluation on May 23, 2016, she had not taken her anxiety medication for several weeks, as she had run out of her prescription's supply. The examining psychiatrist, Fahad Ali, M.D., diagnosed generalized anxiety disorder, agoraphobia without a history of panic disorder, and dysthymic disorder. (R. 20-21.) He assumed management of her psychotropic medications.

In conjunction with her therapist, Charlotte Batcha, a Clinical Social Worker Specialist, Milbourn developed various treatment goals to address past traumas and current stressors. Her treatment plan initially included a series of sessions of "trauma sensitive/trauma informed therapy" and later was updated to add sessions for anxiety and relaxation group therapy and cognitive behavioral therapy. (R. 599.) She discontinued several of the therapy programs in May 2018, as they were "no longer needed," although she continued her individual therapy with Ms. Batcha. (R. 554-59.)

As part of its initial evaluation of her January 5, 2016 DIB application, the state agency referred Milbourn for a consultative psychological examination. At the August 1, 2016 examination, Angela Chiodo, Psy.D. observed that Milbourn's affect was restricted, her insight and judgment were fair, and that all other faculties were intact, normal, or average. (R. 411-14.) She noted that Milbourn drove herself 30 miles to the appointment and was unaccompanied in the exam room. (R. 411.) She recounted that Milbourn did not have hobbies or interests and stays at

3

home, where she does things around the house and cares for her daughter. (*Id.*) She diagnosed "unspecified anxiety disorder" and "rule out panic disorder." (R. 414.) She recommended that Milbourn continue psychological treatment and that she pursue psychosocial rehabilitation, psychiatric intervention, and vocational rehabilitation and training. She opined that Milbourn experienced at most "mild" limitations in her ability to interact with the public and with supervisors due to her restricted affect. (R. 415-17.)

The state agency denied Milbourn's DIB claim on August 11, 2016. (R. 77-81.) She requested a hearing before an ALJ, which was held on May 23, 2018. An impartial vocational expert ("VE") also appeared. (R. 12.) At the conclusion of the hearing, the ALJ left the record open to schedule an orthopedic consultative examination and for counsel, who was newly retained, to obtain and submit recent medical records. (R. 33-34, 62.) Dr. Ali completed a Medical Source Statement on Milbourn's behalf on June 6, 2018, and counsel submitted it to the ALJ for consideration. (R. 530.) The statement reflected his opinion that Milbourn was subject to a marked limitation in her ability to deal with work stress and that she would be absent from work for more than three days per month due to her condition.

On October 11, 2018, the ALJ issued her written decision that Milbourn was not disabled at any time since her alleged onset date. (R. 12.) Milbourn requested review, but the Appeals Council determined on August 30, 2019 that there was no reason to set aside the ALJ's decision, rendering it the final decision of the Commissioner. This litigation followed.

## II.     STANDARD OF REVIEW

This Court must determine whether the ALJ's conclusion that Milbourn could perform jobs that exist in sufficient numbers in the national economy is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F. 3d 546, 552 (3d Cir. 2005). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *See also Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence." *Rutherford*, 399 F.3d at 552. The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence. *Richardson*, 402 U.S. at 390 (citing 42 U.S.C § 405(g); *Rutherford*, 39 F.3d at 552). The review of legal questions presented by the Commissioner's decision, however, is plenary. *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

### III.   DECISION UNDER REVIEW

The issue before the ALJ at the time of her October 11, 2018 decision was whether Milbourn had been disabled within the meaning of the Act since November 1, 2015, her alleged disability onset date and the date on which she stopped working. The ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) to reach her conclusion. At Step One, she found that Milbourn had not engaged in substantial gainful activity since the alleged onset date. (R. 14.) At Step Two, she found that Milbourn suffered from severe, medically-determinable impairments, specifically asthma, fibromyalgia, diabetes mellitus, generalized anxiety disorder, and major depressive disorder. *Id.* At Step Three, she concluded that Milbourn did not have an impairment or combination of impairments that satisfied the criteria of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).  (R. 15-17.)  Plaintiff does not challenge these findings.

The ALJ then considered Milbourn's residual functional capacity ("RFC"), which is defined as "the most [a claimant] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ determined:

> **5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: occasional stooping, kneeling, crouching, crawling, balancing and climbing ramps/stairs; no climbing ropes/ladders/scaffolds; no exposure to unprotected heights/hazards; avoid concentrated exposure to extreme heat, cold, dust, odors, wetness, gases, and fumes; limited to routine, repetitive (unskilled) work not involving direct public interaction, mandated teams, or more than frequent interaction with co-workers and supervisors.**

(R. 17.)  In light of the VE's characterization of Milbourn's prior employment positions as an accounting clerk and a payroll clerk as skilled or semi-skilled positions, the ALJ found at Step Four that Milbourn was unable to perform her past relevant work. (R. 23.)

At Step Five, the ALJ assessed whether Milbourn was capable of performing any other jobs that exist in significant numbers in the national economy considering her age (as a "younger individual" as of her onset date), her high school education, her English language skills, and her RFC.  At the hearing, the VE had testified that a hypothetical individual with the vocational profile described by the ALJ could perform the functions of several representative unskilled occupations, whether at the light exertional level — office helper, final inspector, and cleaner (housekeeping) — or at the sedentary exertional level — gauger,[2] pharmaceutical packager, and egg processor. (R. 24.)  In light of this testimony, the ALJ concluded that Milbourn was capable of making a successful adjustment to other work in the national economy and thus was not disabled. (R.23-24.)

## IV. DISCUSSION

Milbourn contends that the ALJ's RFC finding — that she is capable of performing substantial gainful activity so long as it is unskilled and restricted in terms of direct interaction

---

[2] A gauger is "a worker or inspector who checks the dimensions or quality of machined work." *See* https://www.dictionary.com/browse/gauger.

with the public and frequent interaction with co-workers or supervisors — is the product of legal error. She attributes this error solely to the ALJ's determination to accord "little weight" to the opinion Dr. Ali, her psychiatrist, expressed in his medical source statement of June 6, 2018. (Pl. Br. at 6.) She contends that applicable legal authorities required the ALJ to accord greater weight to Dr. Ali's opinion and that the ALJ's rationale for discounting the opinion was based on speculative judgments about her treatment at the Penn Foundation rather than substantial evidence.

We proceed first to describe in more detail the contours of Milbourn's treatment at the Penn Foundation and next recount the opinion rendered by Dr. Ali on June 6, 2018. We then examine the reasons advanced by the ALJ for giving aspects of that decision limited weight when she reconciled conflicting opinions and rendered her RFC finding. As we set forth below, we do not agree with Plaintiff's reading of the record. Rather, we accept that the ALJ's decision to give little weight to aspects of Dr. Ali's opinion conformed with legal authorities in that she supported her conclusion with substantial evidence in the record.

          1.    **Penn Foundation treatment**

Milbourn contacted the Penn Foundation, where she had received services as a teenager, in the spring of 2016, approximately six months after she stopped working. At the time of her intake evaluation on May 23, 2016, she was dealing with many stressors, including the care of her special-needs child and recent losses of close family members, and she reported feelings of depression and anxiety. She had exhausted her prescription of Ativan by taking additional doses to combat increasing symptoms. In collaboration with her assigned therapist, Ms. Batcha, Milbourn developed various short and long-term goals of treatment, and she agreed to participate in various therapies. Upon examination by psychiatrist Dr. Ali as part of this biopsychosocial evaluation, Milbourn was noted to be alert, fully oriented, well groomed, and cooperative. She

7

displayed normal psychomotor behavior and eye contact, maintained attention and concentration, and showed good short-term memory, although her long-term memory was impaired. She showed normal cognitive functioning and her insight and judgment were both rated as fair.

Records from the Penn Foundation document several of Milbourn's medication management appointments with Dr. Ali and, in one instance, for an unscheduled visit upon recommendation of a therapist, with the clinic's medical director. In a more extensive psychiatric evaluation following the start of her therapy at the Penn Foundation, Dr. Ali observed on September 12, 2016 that her affect was "constrained" and anxious and noted that she complained of depression, abnormal sleep patterns, anxiety, difficulty concentrating, and heart palpitations. She described difficulty in leaving the house and spoke of her fear of being in a new situation or around people because something bad could happen. She explained that when she was working she had difficulty getting out of the house due to increased anxiety. (R. 534-35.) Dr. Ali reiterated the diagnoses of agoraphobia without a history of panic disorder, dysthymic disorder, and generalized anxiety disorder. (R. 535.) He prescribed Ativan and increased the dose of Cymbalta. (R. 536.)

Subsequent to that visit, Milbourn's health insurance plan denied her coverage for Cymbalta. As serotonin withdrawal set in, she experienced a recurrence of crying spells and sleeplessness, as well as suicidal thoughts. When she presented for a therapy appointment on October 24, 2016, the therapist recommended she see the clinic medical director, who obtained a five-day advance of Cymbalta for her. His records noted that Milbourn's mood was labile and that she cried throughout the examination. (R. 550.) When Milbourn was able to see Dr. Ali again on November 7, 2016, he noted that her anxiety and depression had improved with renewal of her medications. (R. 548.) He again noted similar improvement at a follow-up appointment on January

9, 2017, despite anxiety-producing continued psychosocial stressors – e.g., health and legal issues involving her adult and teen-age children.  (R. 537.)  At Milbourn's request to taper off of benzodiazapene drugs, he replaced Ativan with Buspar.  (R. 537, 540.)  Dr. Ali later added another dose of Lyrica in addition to the doses she was already prescribed for management of fibromyalgia pain.  (R. 541.)  These changes were effective and her mood was stable, even in the presence of multiple stressors related to her own health and relationships, as well as legal proceedings involving her daughters.  He noted that her sleep was also improved and that her panic attacks had diminished.  (*Id.*)   Her follow-up appointments with Dr. Ali were scheduled for two or three months out, *see, e.g.,* R. 540, 544, although not all visits appear to be accounted for in the record.

## 2.     Dr. Ali's Medical Source Statement (Exhibit 4F)

On June 6, 2018, a few weeks after Plaintiff's hearing, and presumably at the request of counsel, Dr. Ali completed a medical source statement.  The document detailed the amount of time he treated Milbourn, his diagnoses, a list of her symptoms, and the frequency with which the listed symptoms would be expected to interfere with her attention at work. (R. 530.)  His diagnosis list identified both major depressive disorder, recurrent moderate; and generalized anxiety disorder. (*Id.*) He listed symptoms of: depressed mood, crying spells, intermittent helplessness, anxiety, and panic attacks leading to social isolation.  "Past" symptoms that he identified were concentration and relationship issues. (*Id.*) Dr. Ali indicated that these symptoms interfered with Milbourn's attention and concentration "often" and that she had a "marked limitation" in the ability to handle stress in the workplace. *Id.*  Finally, he opined that her major depressive and generalized anxiety

9

disorders were likely to produce "good days" and "bad days"3 that could well result in more than three absences per month from work. *Id.*

### 3.     Applicable regulations

Social Security Ruling 96-8p identifies "any 'medical source statements'— *i.e.*, opinions about what the individual can still do despite his or her impairment(s)"— as part of the relevant evidence to be reviewed by adjudicators. SSR 96-8p further provides that:

> Medical opinions *from treating sources* about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight.

SSR 96-8p. *See also* 20 C.F.R. § 404.1527(c)(2). If the opinion is not entitled to controlling weight for one of the reasons provided, then the ALJ need not adopt it. However, if the ALJ's ultimate RFC finding "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p.

Our Court of Appeals reminds us that an ALJ "may not make speculative inferences from medical reports" nor make his or her own credibility judgments. *See Morales v. Apfel*, 225 F.3d 310, 17 (3d Cir. 2000). An ALJ's decision may be subject to reversal where the rejection of the claimant's treating doctor's opinion was not supported by objective medical evidence but rather the ALJ's own "amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility." *Id.* at 318. When the treating source's medical opinion is not granted controlling weight, the adjudicator should consider several factors to determine appropriate

---

3 As Milbourn testified at the hearing: "[O]n a bad day, I don't do anything. I literally just kind of sit there in a vegetative state and don't move. If it's really bad, I just cry all the time." (R. 54.)

10

weight: the length of the treatment relationship; the frequency of examinations; the nature and extent of the treatment relationship; the degree of support the evidence provides for the medical opinion; the consistency of such evidence; the degree of specialization of the medical source; and other factors, such as the familiarity of the medical source with SSA's disability programs and their evidentiary requirements, or the medical source's familiarity with the other information in the claimant's case record.  20 C.F.R. § 404.1527(c)(2-6).

### 4. The ALJ properly accorded little weight to Dr. Ali's Medical Source Statement

The ALJ justified her RFC finding as follows:

> In sum, the above residual functional capacity assessment is supported by the persistent diagnostic, physical, and clinical findings of record; the claimant's admitted daily activities which are generally expansive and include significant caregiving responsibilities (Exhibits: 6F, 12F, 14E); her generally routine and conservative level of treatment; and by the opinions of the State agency physician and independent consultative examiners, which have been accorded varying degrees of weight for reasons cited above.

(R. 22.) The ALJ then proceeded to recount each piece of opinion evidence and the weight she gave to it.  With respect to the August 2016 mental capabilities assessment made by the consultative examiner, Angela Chiodo, Psy.D., the ALJ explained that she accorded it "limited weight," as the record as a whole "supports a finding of greater restrictions with respect to the claimant's ability to maintain social functioning and maintain concentration, persistence and pace (Exhibits: 4F, 12F)."  (R. 22.)  The ALJ also explained that Milbourn's testimony regarding anxiety, low energy, and concentration deficits warranted restrictions to routine, repetitive work not involving mandated teams or interaction with the general public. (*Id.*)

11

The ALJ continued with the following analysis of the other piece of opinion evidence in the record concerning Milbourn's limitations arising from her mental health conditions, the assessment of Dr. Ali:

> In addition, the undersigned has accorded little weight to the June 6, 2018, medical source statement from Dr. Fahad Ali M.D., opining the claimant's depression and anxiety were severe enough to "often" interfere with her attention and concentration and would likely result in marked limitation in her ability to deal with work stress, and would on average cause her to miss more than 3 workdays per month (Exhibit 11F). Dr. Ali's findings are incompatible with the grossly normal clinical/mental status findings documented in Dr. Ali's own treatment records (Exhibits: 4F, 12F) and with the claimant's presentation at composite medical examinations and consultative examinations. In addition, the degree of restriction reflected in this assessment is inconsistent with the generally routine and conservative level of treatment the claimant has received as well as with the nature of her admitted daily activities.

(R. 22-23.)

Plaintiff takes issue with the ALJ's characterization of the "level" of Milbourn's treatment as "generally routine and conservative." (Pl. Br. at 6.) The Penn Foundation records, however, provide substantial evidence in support of this characterization. Milbourn responded well to her prescribed medications. When an insurance coverage issue led to a disruption in her Cymbalta prescription, her increased symptoms were sufficiently apparent to a therapist that she was scheduled for an emergency visit with the clinic medical director and given a supply of medication from the clinic pharmacy. When she saw Dr. Ali again two weeks later, her mood had improved, her anxiety had substantially decreased, and she again was able to cope with daily issues. (R. 548.) Records of her psychiatric check-ups with Dr. Ali thereafter do not reveal any downward trend in her condition or in the management of her symptoms. Any changes in medications were gradual and well-controlled. While Dr. Ali endorsed her participation in several therapies designed to develop coping mechanisms and strategies and to work through blocked memories of possible past

12

abuse, inpatient treatment was never contemplated. These therapies were effective, and by May 2018 many of her group placements were deemed no longer necessary. The ALJ's characterization of the "level" of her treatment as routine and conservative does not reflect reversible error.[4]

In addition, the ALJ also justified her rejection of Dr. Ali's opinion because the degree of his restriction was inconsistent with Milbourn's admitted daily activities. As the ALJ described in her decision, "the claimant's admitted daily activities … are generally expansive and include significant caregiving responsibilities[.]". (R. 22.) She cited to three exhibits in support of her characterization. In the first, Exhibit 6F, Dr. Chiodo documented Milbourn's account of an ability to engage in a wide range of activities of daily living independently. *See* R. 21 (noting same as being "of particular note"). The ALJ's second citation was to Exhibit 12F, which contains the Penn Foundation records that document Milbourn's caregiving responsibilities for her teenage daughter. Finally, the ALJ cite to Exhibit 14E, which is a Function Report submitted by Milbourn to the state agency. Plaintiff provides no argument to undermine the ALJ's conclusions as to her "admitted daily activities," and they provide a further basis upon which to conclude that Milbourn retained greater functioning that Dr. Ali's opinion suggested. To be sure, the ALJ's RFC finding also accounted for Milbourn's need to avoid "direct public interaction, mandated teams, or more than frequent interaction with co-workers and supervisors." (R. 17.)

We find sufficient evidence in the ALJ's decision to satisfy us that she properly evaluated Dr. Ali's June 6, 2018 opinion in light of the records of his treatment that were before her. Dr.

---

[4] Plaintiff also contends that the ALJ's comment upon the routine and conservative treatment at the Penn Foundation reflected the ALJ "second-guessing" Dr. Ali's treatment and "inserting her [the ALJ's] opinion in the stead of Dr. Ali[,] which is inconsistent with the legal authorities[.]" (Pl. Br. at 6.) We do not read the ALJ's decision as second-guessing a treatment plan nor rendering any medical opinion concerning Plaintiff.

Ali's records consistently detail Milbourn as cooperative and alert with fair insight and judgment, articulate speech, and logical and linear thoughts. Dr. Ali's notes show that Milbourn progressed under his care. The record does not give us any reason to doubt that the ALJ adhered to the applicable Regulation and assessed the length, nature, and extent of the treatment relationship, the consistency of the medical opinion to the record, the specialization of the treating source, and how well the treating source's opinion was supported by the evidence. The ALJ provided the required analysis for giving non-controlling weight to a treating source's medical opinion. *See* 20 C.F.R. §404.1527(c)(2-6). Thus, Milbourn's argument does not provide a basis to reverse the administrative decision.

## V.     CONCLUSION

We see no basis to reverse this case under sentence four of 42 U.S.C. § 405(g). The ALJ complied with her obligation to evaluate the evidence and explain why she relied on the evidence she did. She did not violate the applicable regulations in her consideration of Dr. Ali's medical source statement. *See* SSR 96-8p; *See also* 20 C.F.R. §404.1527. The ALJ properly weighed the opinion of Dr. Ali against that of his own treating records and the evidence of Milbourn's daily activities. We found no deficiency in the completeness of the ALJ's determination.

The request for review will be denied. An appropriate order will follow.

BY THE COURT:

/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE